The Honorable and the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning everybody, please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. We have three cases on for argument this morning. First up, 25-1430, Simmons v. UM Capital Region Health, Inc. Mr. Wolfson. Good morning, Your Honors, and may it please the Court. Reuben Wolfson with Smithy Law Group in Annapolis, Maryland, on behalf of the appellant, Kristen Simmons. Your Honors, in 2009, Congress amended the anti-retaliation provision of the False Claims Act to protect whistleblowers who did not only engage in an act of whistleblowing in furtherance of an already existing underlying fraud upon the government on a key Tom action, but to protect whistleblowers who prevented such an action before it was perpetrated against the government, before that fraud occurred. And that's exactly what Kristen Simmons did in this case, and Kristen Simmons is exactly the type of whistleblower who Congress intended to protect by that amendment and by this Court's subsequent jurisprudence to that amendment, enshrining the proposition that whistleblowers who prevent a fraud upon the government before it occurs cannot be retaliated against. Again, that's exactly what happened here. Ms. Simmons did exactly that. UM Capital Health, the hospital, had a problem. The problem was it didn't have enough beds in its intensive care unit, ICU. And it also faced a reality, and this is in the 2017-2018 time frame, and that reality was a year or so prior to that, it had been assessed a $6 million penalty by the state of Maryland for its standardized infection ratio, which was the number of hospital-acquired infections and other data it was required to report. Based on those reportings, it was assessed this penalty. And Ms. Simmons, two supervisors in this case, Yojin Lee and Ingrid Connerney, were brought in to the hospital to ameliorate that issue and to clean up infection prevention and to clean up safety within the hospital. And so they faced that problem, and they faced the reality of needing more ICU beds. And so how were they going to get there? Well, there was the ICU unit, and then there was the post-anesthesia care unit, PACU. It's a step-down unit. And there were four beds or approximately four beds in that unit, and they were investigating can we use these beds for ICU patients. And if ICU patients are occupying those beds at least 80% of the time, the answer would be yes. The question then became how do we have to report those beds in that step-down unit, in that PACU unit, to the National Healthcare Safety Network? That is a required reporting obligation on the hospital, and Ms. Simmons knew and her supervisors knew that you could not combine the beds from the temporary or virtual ICU unit with the main ICU unit for reporting purposes. Sorry to interrupt you, but what's your best evidence that that was, in fact, what your client supervisor asked Ms. Simmons to do? Your Honor, there's myriad evidence that – Well, I'd like the best evidence. Sure. Because as I read these exchanges of e-mails, one could – first of all, there's no – you don't disagree that in light of the fact that the hospital had suffered these penalties that they had an incentive to try to figure out a way to do – to increase the number of ICU beds lawfully, right, in order to comply with regulations and try to minimize future sanctions, right? There's nothing wrong with that, at least in the abstract. Absolutely, Your Honor. Nothing wrong with that in the abstract, but they were incentivized to combine the four beds from the step-down unit with the main ICU unit because otherwise if they had to report it as a separate virtual unit, it was going to have, as Ms. Simmons pointed out in an e-mail, an astronomically bad number or standardized infection ratio to report. So what's the evidence that the supervisor actually suggested to your client that they intended to combine those units as opposed to, you know, from your colleague's perspective, a simple request to collect data? Your Honor, two pieces of best evidence in that regard. One is a December 28th e-mail where Ms. Simmons wrote to Ms. Lee, you know, you cannot combine the package. That's your client writing to the supervisor. What's the evidence that the supervisor asked Ms. Simmons to do that? There was oral instructions to Ms. Simmons, and in that e-mail. Where is that in the record? There was discussion about a team huddle. Where is that in the record? I don't have the exact page citation, Your Honor, but there was a team huddle meeting where Ms. Simmons claimed that Ms. Lee gave that instruction. And in the December 28th e-mail, Ms. Simmons wrote to Ms. Lee, you can't do this, quote, as you instructed me to do. Ms. Lee writes back to that e-mail, and she sends a substantive response on other topics in the e-mail, but she doesn't address what she apparently, if she never gave the instruction, what she would contend was a complete fabrication. So if you were a supervisor, if I e-mailed my managing partner and I made some proclamation that she directed me to do something unethical or unlawful, she would throw up her hands and say, wait a minute, Mr. Wolfson. In her response, there is no earthly way I instructed you to do that. Ms. Lee didn't do that. She didn't address it at all. And so it's logical to assume from there that Ms. Lee did give that instruction and all other evidence points to the fact that she did give that instruction. And critically here, there's enough evidence that a jury should make that determination, not the district court as it did. The other piece of best evidence is Ms. Simmons' e-mail on January 14th to her second-level supervisor, Ingrid Connerney, and she's reciting the entire series of events with this directive to count the beds and combine them with Ms. Lee's pushback, with her, with Ms. Simmons going to NHSN and proposing this hypothetical, can we do this. And by the way, Your Honor, I think that's compelling evidence in and of itself because there was no incentive for Ms. Simmons to go to the National Healthcare Safety Network and say, hey, can we do this hypothetically if she wasn't instructed to do exactly that. There would have been absolutely no incentive for her to do that. And so on the January 14th e-mail to Ms. Connerney. Well, hold on. It's another possibility is that your client thought they might be thinking of doing that but had no particularized reason to believe they were actually going to do it. That is a possibility. It is a possibility, Your Honor. And I think it's clear that Ms. Simmons had a subjective belief that this was going to occur. And the question that the court has to answer below or that the protected activity elements necessitate is, was it objectively reasonable? And there are certain data points that point towards that, one of which is the year prior the $6 million assessment that the hospital was hit with. Well, they had every incentive to combine those beds to try to get a better ratio to report to the government for purposes of either a lesser assessment or an award financially. And tracking back to the January 14th e-mail, Ms. Simmons states to Ms. Connerney, you know, I tried to let Ms. Lee. I tactfully tried to let Ms. Lee save face and arrive at this answer herself. I didn't want to sort of throw this e-mail that I got from NHSN corroborating my belief that we couldn't combine the units in her face, but I had every belief that she was going to do this and in turn would violate federal law. And, you know, I had to do that. And she would have violated federal law but for being presented with, I think, quote, incontrovertible evidence that you couldn't combine the beds. And that's what she says to Ms. Connerney on January 14th, which is other evidence, significant evidence that there's a factual dispute as to whether she was given that directive or not. And the district court totally discounted the January 14th e-mail to Ms. Connerney. As far as the objective reasonableness of her belief, Ms. Simmons had also testified, Your Honors, that she had seen Ms. Lee lie during a mock survey with respect to data during her employment. And that is also probative of whether or not she was issued this directive to combine the beds, which would lead to, she believed, an objectively reasonable belief, a violation of the False Claims Act. And that is... Just to be clear, there's nothing, you don't have anything in writing that confirms your client's statement. It's just her, maybe that's sufficient, her statement unrebutted, you say, by the supervisor that she was instructed, in fact, to do this. Because on the face of it, there's a lot of evidence in this record that suggests that all she was asked to do was to collect data. Nothing written from the employer, Your Honor. But another piece of evidence that I think leads to the strong inference, and inferences at the summary judgment stage have to be drawn in favor of the non-moving party, not the moving party, is that one of the allegations that Ms. Simmons makes is that this directive from Ms. Lee was verbalized at a team huddle meeting on December 21st. That leads her to then go to NHSN, and when she gets the response from NHSN, she immediately forwards it to her colleagues on her team, Keisha Gates and Cindy Rosenberger, with essentially the statement, you know, we can't do this. As we've been discussing, I'm afraid that I'm going to be the fall person, so to speak. I'm forwarding this just in case. If that directive had never been issued at that team meeting, there is no reasonable person would have forwarded it to her colleagues because those colleagues would have thrown up their hands and said, what is Kristen Simmons talking about here? There was never an instruction given at that meeting to combine the PACU beds with the main ICU beds. But for that meeting occurring, she never would have done that, and it doesn't make sense for any employee to do that to coworkers who wouldn't have heard the same instruction. So I think there's a lot of different pieces of evidence here that create a genuine issue of material fact, and the fact that goes to the heart of this dispute, which was she instructed to do something that, if followed through with, would have led to a perpetration of fraud upon the government. With respect to transitioning, Your Honors, to the disability discrimination claim, which is the other claim at issue here in terms of the district court's grant of summary judgment in favor of the OPEL-EUM capital, the issue is pretext. The court assumes the Prima Fascia case. The court assumes the legitimacy of the proffered non-discriminatory reason for the termination and for the other adverse actions herein, and so the issue becomes pretext. And the fact is, Your Honor, there is a mountain of pretextual evidence here, such that a jury needs to resolve those issues, not the court. For example, the own documentation of UM Capital, their performance evaluation, Ms. Lee's performance evaluation of Ms. Simmons, covers 12 of her 17 months of employment there, and it doesn't state a shred of concerns about behavioral concerns, communication issues, anything else. She received the second highest rating in all 16 categories. Her work was praised and called, quote, self-directed, competent, and included other leaders calling her excellent. That's fair, but at the same time, there's this chronology of events on a different front, suggesting that there were significant communication issues with respect to Ms. Simmons and her supervisor, their interactions in meetings and huddles and the like. So what are we supposed to do with that? I think there's clear evidence that within the first three or four months of her employment during her probationary period, there were issues, right? She then graduates, so to speak, from the probationary period and- Which was extended, right? Which was extended by one month. She then completes it, and then- Which isn't typically done if someone's doing a really super job, right? I wouldn't think so, Your Honor. No, not typically done, but employees can also improve, and it's very clear that by their very documentation, the performance evaluation, Ms. Simmons did improve. There's no incentive or reason for an employer to fabricate a performance evaluation that is, generally speaking, very positive when, in fact, they didn't do that. Your mileage may vary. I read this performance evaluation, and it seems fine. I would not describe it as very positive. Fair enough, Your Honor. At least a satisfactory evaluation, right? There were no indications of the concerns that were brought to bear at the time of the termination. There were no indications of them. And there's other evidence of pretext in that regard with respect to the performance. For example, the MedMind incident or the MedMind surveillance project occurred in July of 2018. In the September 18 performance evaluation, her work on that project was praised. Months and months later, at the time of the termination, it was denigrated. So which is it? That, in and of itself, from the employer, presents a factual dispute as to whether her performance was good, satisfactory or otherwise, or whether she was having these concerns. If you've got two competing, I guess, plausible explanations, is it your burden to show that the one leading to a finding of discrimination based on disability was the but-for cause of her termination? Your Honor, I do think it is the but-for cause or a but-for cause. Obviously, the retaliatory discharge in violation of the False Claims Act is another theory of retaliation here. And as the Supreme Court outlined in the Bostock v. Clayton County case, but-for causation can be a but-for cause. It can be a number of but-for causes to relate to an adverse action. I would also say, as far as, I see that I'm out of time, Your Honor. You can finish answering. Let's also say thank you, Your Honor. In terms of evidence of pretext on that front, they failed to follow their own progressive discipline policy, and they offered shifting explanations for the termination at various points of time, including that there was no explanation presented to Ms. Simmons at the time of her termination, the bed-counting controversy was cited to the EEOC in its position statement, and then later it's now shifted to behavioral and communication issues. All right. Thank you very much. Ms. Davis? Thank you, Your Honors. And I will apologize as I start. I do have a little bit of a cold, so I may start coughing, but I have some water here, so hopefully I will be able to press through. May it please the Court, I am Allison Davis, and also with me is Morgan Kinney representing UM Capital Regional Health, formerly known as Dimensions Health Corporation. I wanted to start in responding to Mr. Wolford's arguments regarding the fact that Ms. Simmons engaged in protected activity under the Federal False Claims Act and the Maryland False Claims Act. As Judge Diaz has pointed out by his questioning, there is little evidence in the record that shows that Ms. Simmons was ever instructed to engage in any activity that would have violated any of appellees' obligations for making reports about usage of beds. What about the December 28th and January 14th emails? What happened here are Ms. Simmons drafting emails because she understood that she did not want to do, ultimately go through the exercise that her supervisor instructed her to do.  Well, I'm now going to quote directly from JA442 where Simmons' email says that Lee, that's Simmons' boss, right? Simmons says that Lee, quote, continued to express that her, Lee's intention, is to simply add the PACU numbers into another unit. The email says that, right? The email says that. There are emails also where Ms. Simmons says that these instructions were given at team huddles. Great. And at summary judgment, don't we have to assume that that actually happened? You do not have to rely solely on testimony from Ms. Simmons or documents that she created.  You've just identified my biggest concern with the district court's decision, where the district court says exactly that. And with all due respect, that gets summary judgment exactly wrong. If the plaintiff testifies that something happened at summary judgment, you have to assume that thing happened. Not if there are other witnesses. Not true. That is not how summary judgment works. Summary judgment does not say three people say X didn't happen, one person said it did. I, the district court, in adjudicating a summary judgment motion, decide which of them I believe. But you also have to look at the entire record. No, that's not true. I mean, I know this because I wrote a published opinion last year saying this exact thing. That's not, you don't look at the whole record in resolving summary judgment. You view the evidence in the light most favorable to the non-moving party, and you assume that everything they've entered competent evidence of is true, and that anything that's inconsistent with that, the fact finder would reject. That's how summary judgment works. You look at here where Ms. Lee gave her an instruction to count bets. Right. Right? And then you go through the exchanges between Ms. Lee and Ms. Simmons. Right. Which show that Ms. Lee consistently says that I just need you to collect data. Except that the plaintiff says that Lee said something else, and for summary judgment you have to assume the plaintiff is telling the truth when she says that. So if we assume that Ms. Simmons is telling the truth, that she was instructed to combine bets, there is still an element that is missing. Lee does not, Simmons does not just say that. She says in that email that Lee had said that Lee intends to combine the information, right? Correct. Okay, I'm sorry. Go ahead. I'm assuming what she said is true. Okay. But what is missing from the record is any evidence that there was ever any data to be submitted to NHSN. Ms. Simmons had not completed the exercise of collecting the data. So there was nothing for Ms. Lee to submit to NHSN. So even if you assume was true that she was instructed, it's all speculative as to what the data would have shown. So let me give you a hypo then that I think seems to get to this. So I manage a tax accounting firm, say, and I tell my employee that I want her to collect certain data about our firm because I want to do X with it. And X is something that one could reasonably believe would be tax fraud. Would it be objectively reasonable for the employee to believe that I'm about to commit tax fraud? Not under the circumstances where the employee does not have the information as yet that would show. The employee doesn't want to collect the information because they perceive their supervisor has just said that they're going to use this information to commit tax fraud. So we have a disagreement between a direct report and a supervisor as to the completion of a task, which is speculative on the part of the employee. It's not speculative if there is evidence in the record that the employer told the employee what they intend to do with the information. But you don't have the information. What information are they going to use? You need to know what that information is in order to reach the conclusion that the supervisor is directing them to engage in tax fraud. Similarly here with Ms. Simmons, she was told to collect data. And in her mind, without going through the exercise, she decided that the way in which the options that Ms. Lee was looking at for reporting the beds was incorrect. But we will never know whether or not she had a sound basis for that because she never had the data. No data was presented to her colleagues. No data was presented to Ms. Connery. No data was presented to Ms. Lee. We just have that Ms. Simmons is given the instruction to go count beds, beds which had not been analyzed at all. They were not being reported, so nobody knew what the usage was. Is that a preliminary question here? My understanding, but this is not my area of the law, this is how these beds are counted and such, was that they first had to collect data about how they're being used, right? That's the 80% rule. Before they even knew, can these beds be included in an ICU, whether it's counted as a separate unit or combined or any of these? Those are secondary questions to first getting the data on how these beds are even being used. Is that a correct understanding? That is correct because depending on how it's used determines whether or not the hospital, in fact, needed to report them. And if they were going to report them, how to report. Then how to do it, right? So the how to do it is down the road. And our question here is, is it objectively reasonable to believe the employer is currently violating the FCA or will soon violate the FCA? Based on the information that is possessed at the time that the employee engages in what they describe as protected activity. Thanks. I will move on to address the issue regarding pre-tax, if there are no more questions relating to the issue of protected activity. Once again, if you look at the record, you see that Ms. Simmons overlooks the clear history here that from the day she started working as an infection practitioner that there was a conflict between her and Ms. Lee. That's clearly true, but I'm not sure that it's appropriate to characterize it as a clear history or maybe a clear record because this is brought up in your colleague's argument earlier. He pointed to a couple of things. Maybe he didn't point to the second one that I'm about to say, but he pointed to the evaluation report, which even if not stellar or outstanding, seems a little bit, not a little bit, significantly inconsistent with the notion that this was a problem employee in terms of communication and the other issues that came out during the counseling sessions. Then you've got this policy of progressive discipline, which seems to have been entirely ignored in the process of deciding whether or not to keep Ms. Simmons on. Don't those two sort of pieces of evidence suggest that there's an issue here to be tried by a jury? I'll start first with addressing the issue of the progressive discipline policy. If you read that policy closely, you'll notice that it gives the employer here at UM Capital the discretion not to follow all of the steps in progressive discipline. That's one. Two, progressive discipline can take different forms, and here the record is replete with instances where Ms. Simmons was getting feedback about her communication style, her appearance not to be engaged in meetings. So can I ask you about that exception that you just pointed out that the employer doesn't need to follow? I mean, it's fair to say that it's discretionary, but it does seem to suggest some limits in terms of exercising discretion. It suggests that if you're not going to follow it, it should generally be for serious violations or misconduct. And communications issues, I suppose, can debilitate an organization and amount to serious misconduct, but it doesn't seem like it, at least initially, that it warranted that kind of a result in the end. A progressive discipline policy is intended to ensure that the employee is given an opportunity to improve their performance, that they're given a warning before it results in termination. Here we have over a year and a half of feedback that was being provided to Ms. Simmons with respect to the fact that the way in which she was interacting with her supervisors and others was unsatisfactory. The fact that an employee gets a positive performance review does not mean that the employer should look the other way if performance issues reoccur or start anew. I don't disagree with that, but it seems like the most logical place to make that known, in addition to the informal counseling sessions, is in the report, right? And if it's not in there, that suggests that maybe this is not really about her performance but about something else. So if you look at the record, the performance review was in September of 2018 and covered the prior year from September 27 to 2018. We now have the period from September 2018 after that performance review. But according to your current account, she was, in fact, having communication problems during the time covered by this performance review, right? She was continuing to have issues. So why is that mentioned literally nowhere in the performance review? And that is an issue that frequently – It's a bad fact for you, isn't it? It's a bad – but it is not unusual for supervisors to be reluctant to address – Okay, but we have a published opinion. You're familiar with it, right? It's a published opinion in Calgo versus First Data that says the natural inference is that if an employer has serious concerns about an employee's performance, that would be in their performance review, and that if it's not in their performance review, that, all other things being equal, supports a finding of pretext because it suggests the employer isn't really doing this for the reason they're now claiming. We seem to have a directly on-point case that says this is a really big problem for you. We also have the timing of the performance review and how close it comes in time to when the decision to terminate was made. No, but it's – all we're trying to do right now is try to figure out why the decision to terminate was made. She makes a prima facie case. You agree with that. You offer a facially legitimate, non-discriminatory reason. We all agree with that. So now the only question is whether the reason you gave is pretext. And the problem is the reason you gave doesn't explain why this isn't mentioned in the performance evaluation because according to the reason that you're currently giving, the problems that you say led to her termination were very much going on at the time of this evaluation. And the fact that it's not in the evaluation, on balance, tends to support a conclusion, by a jury perhaps, that the reason your client is giving right now is not the real reason. That's the only reason we care about any of this from a Title VII or an ADA perspective, right? Correct. But also, as I've stated before, the performance issues, yes, they went on throughout the history of Ms. Simmons working there. And, yes, as you know, this particular annual performance review does not note it. However, it is clear from the record that her managers continue to hold her accountable for complying with the obligation to be able to be respectful to both her managers... What do I do with the fact that the district court seemed to completely ignore the fact that the plaintiff testified? So let's take the first comment about her face and just put that aside because of the argument that the person who made it at the time had no basis of knowing she had a disability. But according to the plaintiff, there were continued comments about her facial expressions after people were put on notice that she had a disability. And when I read the district court's opinion, I see no acknowledgement of the fact that the plaintiff testified to that. What do I do with that? You have to look at the other evidence that the court did consider. No, no, no. Again, I'm going to come back to you don't get to ignore the plaintiff's evidence because you find the other evidence more persuasive at summary judgment. I don't believe that the district court ignored... Where does the judge... The judge literally, I mean, he said, the district judge says the only evidence of these comments are notes and then the court analyzes the notes and concludes on balance they don't help her. The court literally does not mention the fact that the plaintiff testified that after she had told people she had a disability, people kept making comments about her face. But there is no connection between the decision to terminate and the comments about her face. What she was told was that they understood that she did not have to smile. That's also in the record that there are other ways for her to show that she was engaged. And Ms. Simmons chose not to do that. She also chose to engage in other conduct that demonstrated that she did not respect her supervisor. And there's also in the record evidence that... She continued to demonstrate that she... I mean, look, disrespecting your supervisor is a really good reason to discipline and terminate someone. It's also the kind of thing I would expect to show up in a performance evaluation. Is there contemporaneous documentation of all of these problems beyond the once-a-year performance review? There are emails and notes in the file of where either her immediate supervisor and or Ms. Connery, the next-level supervisor, are talking to human resources about the issues. There are also email communications between Ms. Lee and Ms. Simmons about ongoing issues. So this is not a situation where we have a performance evaluation and then we have competing after-the-fact testimony about, well, we didn't put it in the performance review, but really she was a problem employee from day one. That might be a different case, and those are cases we've had in the past. But here we have documentation from day one in the record of these negative evaluations, whether they're not the one annual, right, but that there are problems with her communication and rudeness and insubordination and that she's made aware, that HR's made aware, that this is documented by the employer in real time, right? This is not a post-hoc creation in depositions, is it? That is correct. And I'll also note that with respect to the one performance evaluation that she got that, again, covered the time period from her commencement of employment in September 2017 through 2018, yes, it does not mention the ongoing issues of communication and disrespect. However, it covers the time period where there's clear documentary evidence that she was given feedback about the fact that her behavior was unsatisfactory. It is during that same time period that her initial probationary period was extended for this very reason. So the fact that there's no mention in the annual review of these ongoing issues does not mean that it did not exist because we know that it was raised and we know that it was during that time period. The question is, why didn't the supervisor remind Ms. Simmons that her initial probationary period had to be extended because of issues of disrespect in communication? We need testimony from Ms. Lee regarding what her thought process was. We can't speculate about that. But the one thing that we do know is during that time period, there were issues and they were addressed. Could you address the one-on-one meetings and the end of the one-on-one meetings and what, if anything, we're supposed to infer from that? I don't believe there's anything to infer from that because there's no evidence showing that Ms. Lee continued to meet one-on-one with other members of her team or that there weren't other reasons that the meetings got canceled. Didn't Ms. Simmons say she didn't want to meet with Ms. Lee one-on-one? I was confused by that. Aren't there things in the record where she tells her coworkers, like, I'm looking for excuses not to get together with Lee? She asks the HR, please don't make me meet with her one-on-one. And now the complaint is she stopped meeting with me one-on-one? Yeah, and that is what the record shows. And when we were talking about the one-on-ones, I meant the one-on-ones that she said she would only continue to have if HR was present. And we know that Ms. Lee agreed to have those meetings, but there are numerous reasons why meetings get canceled. And there's nothing in the record to show that Ms. Lee had never canceled meetings before with Ms. Simmons. But didn't Ms. Lee testify that if an employee is having trouble, one-on-one meetings are especially important in that situation? They are, but if there are other demands on everybody's time, as Mr. Wilson mentioned, the fact that at this point in time, UM Capital was working to turn around the hospital, those would be priorities. These just all sound like there's a good explanation that a jury could believe. They don't strike me as this means the plaintiff's claims fell as a matter of law. But the plaintiff has not put forward, and I've run out of time. You can answer. The plaintiff has not put on any evidence to show that the reason why Ms. Lee canceled one-on-one meetings was because she no longer wanted to help her improve in retaliation, either for reaching out to NHSN or because she requested an accommodation. And, I mean, her argument in the brief is she's no longer having one-on-one meetings with me, and therefore we should infer that my performance is not a problem, right? Because, I mean, I think I read the brief to make the argument that if I was having a problem, there would be one-on-one meetings. And because there aren't any, you should infer that all of the problems disappeared and I was being a model employee. Is that a reasonable inference that a jury could make? There's all this other evidence, right? And there's no evidence to support that proposition. That if you have one-on-one meetings, an employee will improve. In fact, there are cases where there are one-on-one meetings and there is no improvement. Thank you, Counsel. Thank you. May it please the Court. I'd like to start with the discussion that Ms. Davis engaged in with the bench regarding the disability discrimination and the evidence of pretext. And I want to address just briefly the progressive discipline policy first, which was one of our arguments that the hospital failed to follow its own progressive discipline policy with respect to terminating Ms. Simmons. As such, that is one indicator for pretext. There is an exception. You don't always have to follow a progressive discipline policy. That exception is if the employee engaged in severe misconduct. That's not even been alleged against Ms. Simmons here. So there was no reason for the hospital not to follow its own policy. With respect to the performance evaluation. So one of the examples in that policy handbook of severe misconduct is disrespect, right, to superiors and subordinates. And isn't that what the complaint was all about with respect to your client? Your Honor, I agree, but I think that's a jury question to determine whether it was severe or not, right, whether they ignored this policy or not, whether it was pretextual or whether it was legitimate. And with respect to the one-on-one coaching meetings. Is there any evidence in the record about how other employees were treated under the progressive disciplinary policy? Like are other employees who were rude and insubordinate, you know, still subject to that policy? Not specific to that issue, Your Honor. No, nothing in the record on that front. With respect to the one-on-one meetings, Ms. Lee did testify in her deposition that one-on-one meetings are especially important for employees that need coaching. And the facts demonstrate that the reason HR was present in those one-on-one meetings was not just because Ms. Simmons asked, because it was a reasonable accommodation that she asked for and was granted. And so in November 2018, a couple months prior to the termination, those meetings stopped, which I think is an indicator of discrimination in and of itself. If you've got a problem employee, as you contend, who needs coaching, why would you stop? Can I go back? When you say reasonable accommodation, do you mean like within the magic words of the ADA, reasonable accommodation? Yes, that was one of the. How is having a third person present at a meeting a reasonable accommodation under the ADA? Your Honor, it was something that Ms. Simmons had requested. Because the two of them really didn't like each other. I just don't—a reasonable accommodation for the person's disability. It just seems weird to refer to a request of a third person present during a meeting as— and not a person who like helps you move around or helps you read something, but just literally have the person be there to like keep the temperature down. That seems like not the most obvious form of reasonable accommodation to me. I completely understand, Your Honor, and would state that the reason for the request, I believe, at the time was given the discriminatory comments, as Ms. Simmons alleged, that Ms. Lee made with respect to her facial expressions, et cetera. That was the impetus for the request. It was approved, and that's why HR was present. I just wanted to note that. But I think it speaks to the fact that their contention just— What is the evidence about the comments, other than someone made a comment before they knew about her disability? What's the other evidence? The evidence, Your Honor, for the comments, the discriminatory comments, was Ms. Simmons' testimony, the fact that Ms. Simmons complained to HR. What exactly did she say? I thought she had said, you know, they criticized me and, you know, kept criticizing, and it kept happening. But I didn't see anything saying, like, on this date someone said X, on this other date someone said Y. Is there something specific in the record other than that one comment? I don't think—I didn't mean to cut you off, Your Honor. I don't think so subsequent to the meetings with HR where the complaint was raised. So once she revealed her disability, there's no evidence in the record of specific comments? Not to my recollection, Your Honor. And I would just note that the coaching reflects, if you've got a problem employee and you've testified on the record that coaching problem employees in one-on-one meetings is critical and then you cease those meetings, it's indicative of pretext. There's also disparate treatment as to the pretext argument, right? There's this contention that, you know, after protected activity on the disability discrimination front, Ms. Lee started carrying a notebook around with Ms. Simmons' name on the cover, and there's no evidence in the record that she carried such notebooks with respect to the comparators. There's evidence in the record— Is there evidence she did not carry a notebook with respect to the comparators? No, Your Honor, but I would note that— Isn't that kind of what we need? Well, at this stage, all reasonable inferences must be drawn in favor of the non-moving party. Yeah, but we don't make up evidence, right? You need evidence, not that they didn't put forward evidence of all these other things. You need evidence that supports your claim. That's correct, Your Honor. I realize I'm out of time. May I just close briefly? Briefly. Thank you, Your Honor. In correctly applying the standards of Rule 56 here, and based on this Court's subsequent jurisprudence to the 2009 amendments of the False Claims Act, it's clear that Ms. Simmons had an objectively reasonable belief that her employer was instructing her to submit data, collect data, and submit it for a fraudulent purpose. She acted to stop that violation before it could occur, and with respect to that claim as well as the disability discrimination claim, there's enough here that this should not have been resolved by the District Court on summary judgment. This case needs to be tried before a jury. Thank you. Thank you, sir. We'll come down. We're going to take a chance with you, Ms. Davis, and come down and greet you. Hopefully, you won't knock us all out of commission and then move on to our second case. Thank you.
judges: Albert Diaz, Allison J. Rushing, Toby J. Heytens